# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of:<br>The LiveMe account with SID 7838985 and/or UID<br>1221873140959944705, also known as "Bbg051151" | )<br>)<br>)<br>)<br>)<br>) |

Case No. 2:20-MJ-4709

## APPLICATION FOR WARRANT BY TELEPHONE PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A*

There are now concealed or contained the items described below:

*See Attachment B*

The basis for the search is:

☑ Evidence of a crime;
☑ Contraband, fruits of crime, or other items illegally possessed;
☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| *Code section(s)* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 2252A(a)(2)(A) | Receipt and Distribution of Child Pornography |
| 18 U.S.C. §§ 2252A(a)(5)(B) | Possession of Child Pornography |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

_____
*Applicant's signature*

Clint Wilmsen, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and State: _____

_____
*Judge's signature*

John McDermott, U.S. Magistrate Judge
*Printed name and title*

AUSA: Jeffrey Chemerinsky x6520

## **AFFIDAVIT**

I, Clint Wilmsen, being duly sworn, declare and state as follows:

### I.   **INTRODUCTION**

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), United States Department of Justice, and have been so employed since December 2002.  As an FBI SA, I received training at the FBI Academy and other Law Enforcement Training venues.  I was trained to manage and run criminal investigations, including online investigations utilizing the identification and research of social media along with email and IP address tracking and analysis.  I received a Bachelor of Arts degree in English from California State Polytechnic University, Pomona, and a Juris Doctorate degree from the University of California, Los Angeles.  I am currently assigned to the FBI's Los Angeles Field Office, West Covina Resident Agency, where my duties include the investigation of federal crimes, including crimes involving child pornography.

2.   During my employment with the FBI, I have participated in numerous investigations involving complex federal crimes, including international investment schemes, government program fraud, public corruption, national security, online extortion, and child pornography.  I have conducted interviews, IP address research and analysis, search warrant executions, evidence collection, and evidence review in support of child pornography investigations.

## II. __PURPOSE OF AFFIDAVIT__

3.    This affidavit is made in support of an application
for warrants to search the following account:

a.    The LiveMe account with SID 7838985 and/or UID
1221873140959944705, also known as "Bbg051151," (the "SUBJECT
ACCOUNT") that is stored at the premises controlled by LiveMe
America, Inc., also known as "Live.me," ("LiveMe" or the
"PROVIDER"), a provider of electronic communication and remote
computing services, headquartered at 7998 Santa Monica
Boulevard, Unit A & B, West Hollywood, CA 90046.[1]  The
information to be searched is more fully described below and in
Attachment A.  This affidavit is made in support of an
application for a warrant under 18 U.S.C. §§ 2703(a),
2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require the PROVIDER

---

[1] Because this Court has jurisdiction over the offense(s) being
investigated, it may issue the warrant to compel the PROVIDER
pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A).  See 18
U.S.C. §§ 2703(a) ("A governmental entity may require the
disclosure by a provider . . . pursuant to a warrant issued
using the procedures described in the Federal Rules of Criminal
Procedure . . . by a court of competent jurisdiction") and 2711
("the term 'court of competent jurisdiction' includes -- (A) any
district court of the United States (including a magistrate
judge of such a court) or any United States court of appeals
that -- (i) has jurisdiction over the offense being
investigated; (ii) is in or for a district in which the provider
of a wire or electronic communication service is located or in
which the wire or electronic communications, records, or other
information are stored; or (iii) is acting on a request for
foreign assistance pursuant to section 3512 of this title").
[2] The government is seeking non-content records pursuant to 18
U.S.C. § 2703(d).  To obtain the basic subscriber information,

to disclose to the government copies of the information (including the content of communications) described in Section II of Attachment B.  Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B.  Attachments A and B are incorporated herein by reference.

4.    The requested warrants seek authorization to seize evidence, fruits, and instrumentalities, as specified in Attachment B, of violations of 18 U.S.C. §§ 2252A(a)(2)(A) (receipt and distribution of child pornography) and 2252A(a)(5)(B) (possession of child pornography).

5.    The statements contained in this affidavit are based on, among other things: (1) information provided by FBI Special

---

which does not contain content, the government needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To obtain additional records and other information--but not content-- pertaining to subscribers of an electronic communications service or remote computing service, the government must comply with the dictates of section 2703(c)(1)(B), which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The requested warrant calls for both records containing content (see Attachment B-2 paragraph II.10.a.) as well as subscriber records and other records and information that do not contain content (see Attachment B-2 paragraph II.10.b.).

Agents; (2) written reports about this and other investigations received, directly or indirectly, from other law enforcement agents; (3) information gathered from the service of administrative subpoenas; (4) the results of physical and electronic surveillance conducted by law enforcement agents; (5) independent investigation and analysis by FBI agents/analysts and computer forensic professionals; and (6) Special Agent Wilmsen's experience, training and background as a Special Agent with the FBI.  Unless otherwise indicated, all conversations and statements described in this affidavit are related in substance and in part only.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, every fact known regarding this investigation is not included.

## IV. <u>SUMMARY OF PROBABLE CAUSE</u>

6.    As set forth below, on February 24, 2020, an FBI Online Covert Employee ("OCE"), a member of the FBI Child Exploitation Task Force in Salt Lake City, Utah ("SLCCETF"), conducted an online undercover session and observed LiveMe account with SID 7838985 and/or UID 1221873140959944705, also known as "Bbg051151," (i.e., the SUBJECT ACCOUNT), post a link to a folder containing videos and images of nude prepubescent children, some engaged in sexual acts with adults and/or other children.

## V. <u>DEFINITION OF TERMS</u>

7.    The following terms have the indicated meaning in this affidavit:

a.    The terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in Title 18, United States Code, Section 2256.

b.    The term "computer" is defined as set forth in Title 18, United States Code, Section 1030(e)(1).

c.    The term "email" (electronic mail) is defined as the messages sent from one person to another via a computer. Email may also include files sent as attachments to or embedded within text messages.  Email can also be sent automatically to a large number of addresses via a mailing list.

d.    The term "Internet" is defined as the worldwide network of computers—a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide.  The Internet is not an online service and has no real central hub.  It is a collection of computer networks, online services, and single user components.  In order to access the Internet, an individual computer or digital device user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

e.    The term "Internet Protocol" ("IP") is defined as the primary protocol upon which the Internet is based.  IP allows a packet of information to travel through multiple

networks (groups of linked computers) on the way to its ultimate destination.

f.    The term "IP Address" is defined as a unique number assigned to each computer or digital device directly connected to the Internet.  Each computer or device connected to the Internet is assigned a unique IP address while it is connected (for example, 172.191.142.150).  The IP address for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning that the IP address is only assigned for the duration of that online session.

g.    The term "Internet Service Provider" ("ISP") is defined as a business that allows a user to dial into or link through its computers thereby allowing the user to connect to the Internet for a fee.  ISPs generally provide only an Internet connection, an electronic mail address, and maybe Internet browsing software.  A user can also connect to the Internet through a commercial online service such as AT&T, Verizon, or Time Warner Cable.  With this kind of connection, the user gets Internet access and the proprietary features offered by the online service, such as chat rooms and searchable databases.

h.    The term "Cloud Storage" is defined as a network of online storage where data is saved in virtual storage that is hosted by third parties.  The hosting companies operate large data centers, possibly across multiple servers.  Cloud storage allows users to save files and data online and access their

information from anywhere using any digital device with an
Internet connection.

        i.    The terms "jpeg," "jpg," "gif," "bmp," and "art"
are defined as graphic image files, namely, pictures.

        j.    The terms "mpeg," "mpg," "mov," "avi," "rm," and
"wmv" are defined as video or movie files.  To use these video
files, one needs a personal computer or other digital device
with sufficient processor speed, internal memory, and hard disk
space to handle and play typically large video files.  One also
needs a video file viewer or client software that plays video
files.  One can download shareware or commercial video players
from numerous sites on the Internet.

### V.  BACKGROUND ON E-MAIL AND SOCIAL MEDIA ACCOUNTS AND THE PROVIDER

    8.    In my training and experience, I have learned that
providers of e-mail and/or social media services offer a variety
of online services to the public.  Providers, like the PROVIDER,
allow subscribers to obtain accounts like the SUBJECT ACCOUNT.
Subscribers obtain an account by registering with the provider.
During the registration process, providers generally ask their
subscribers to provide certain personal identifying information
when registering for an e-mail or social media account.  Such
information can include the subscriber's full name, physical
address, telephone numbers and other identifiers, alternative e-
mail addresses, and, for paying subscribers, means and source of

payment (including any credit or bank account number).  Some providers also maintain a record of changes that are made to the information provided in subscriber records, such as to any other e-mail addresses or phone numbers supplied in subscriber records.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of an account.

9.   Therefore, the computers of the PROVIDER are likely to contain stored electronic communications and information concerning subscribers and their use of the PROVIDER's services, such as account access information, e-mail or message transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.

10.  A subscriber of the PROVIDER can also store with the PROVIDER files in addition to e-mails or other messages, such as address books, contact or buddy lists, calendar data, pictures or videos (other than ones attached to e-mails), notes, and other files, on servers maintained and/or owned by the PROVIDER. In my training and experience, evidence of who was using an account may be found in such information.

11.   In my training and experience, e-mail and social media providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, e-mail and social media providers often have records of the Internet Protocol ("IP") address used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNT.

12.   In my training and experience, e-mail and social media account users will sometimes communicate directly with the service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers of e-mails and social media services typically retain records about such communications, including records of contacts between the user and the provider's support services,

as well records of any actions taken by the provider or user as
a result of the communications.  In my training and experience,
such information may constitute evidence of the crimes under
investigation because the information can be used to identify
the user(s) of a SUBJECT ACCOUNT.

13.  I know from my training and experience that the
complete contents of an account may be important to establishing
the actual user who has dominion and control of that account at
a given time.  Accounts may be registered in false names or
screen names from anywhere in the world with little to no
verification by the service provider.  They may also be used by
multiple people.  Given the ease with which accounts may be
created under aliases, and the rarity with which law enforcement
has eyewitness testimony about a defendant's use of an account,
investigators often have to rely on circumstantial evidence to
show that an individual was the actual user of a particular
account.  Only by piecing together information contained in the
contents of an account may an investigator establish who the
actual user of an account was.  Often those pieces will come
from a time period before the account was used in the criminal
activity.  Limiting the scope of the search would, in some
instances, prevent the government from identifying the true user
of the account and, in other instances, may not provide a
defendant with sufficient information to identify other users of

the account.  Therefore, the contents of a given account,
including the e-mail addresses or account identifiers and
messages sent to that account, often provides important evidence
regarding the actual user's dominion and control of that
account.  For the purpose of searching for content demonstrating
the actual user(s) of a SUBJECT ACCOUNT, I am requesting a
warrant requiring the PROVIDER to turn over all information
associated with a SUBJECT ACCOUNT with the date restriction
included in Attachment B for review by the search team.

14.  Relatedly, the government must be allowed to determine
whether other individuals had access to a SUBJECT ACCOUNT.  If
the government were constrained to review only a small
subsection of an account, that small subsection might give the
misleading impression that only a single user had access to the
account.

15.  I also know based on my training and experience that
criminals discussing their criminal activity may use slang,
short forms (abbreviated words or phrases such as "lol" to
express "laugh out loud"), or codewords (which require entire
strings or series of conversations to determine their true
meaning) when discussing their crimes.  They can also discuss
aspects of the crime without specifically mentioning the crime
involved.  In the electronic world, it is even possible to use
pictures, images and emoticons (images used to express a concept

or idea such as a happy face inserted into the content of a
message or the manipulation and combination of keys on the
computer keyboard to convey an idea, such as the use of a colon
and parenthesis :) to convey a smile or agreement) to discuss
matters.  "Keyword searches" would not account for any of these
possibilities, so actual review of the contents of an account by
law enforcement personnel with information regarding the
identified criminal activity, subject to the search procedures
set forth in Attachment B, is necessary to find all relevant
evidence within the account.

16.  This application seeks a warrant to search all
responsive records and information under the control of the
PROVIDER, which is subject to the jurisdiction of this court,
regardless of where the PROVIDER has chosen to store such
information.

17.  As set forth in Attachment B, I am requesting a
warrant that permits the search team to keep the original
production from the PROVIDER, under seal, until the
investigation is completed and, if a case is brought, that case
is completed through disposition, trial, appeal, or collateral
proceeding.

a.   I make that request because I believe it might be
impossible for a provider to authenticate information taken from
a SUBJECT ACCOUNT as its business record without the original

production to examine.  Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case.  If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from a SUBJECT ACCOUNT.

        b.   I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers.  For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted.  As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account.  Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

## VI.    <u>BACKGROUND ON USE OF COMPUTERS, CHILD PORNOGRAPHY, AND THE USE OF LIVEME AS A MEANS FOR SHARING CHILD PORNOGRAPHY</u>

    18.  Based upon my training and experience in the investigation of child pornography and with peer-to-peer file sharing programs, and information related to me by other law

enforcement officers involved in the investigation of child pornography offenses generally, I know the following information about the use of computers and child pornography.

19.  Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized.  Child pornographers can now produce both still and moving images directly from a common video camera and can scan these images into computer-readable formats.  The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

20.  Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or on virtual servers accessible from any digital device with an Internet connection (i.e., "cloud storage").  Computer users frequently transfer files from one location to another, or from one digital or storage device to another, such as from a phone to a computer or from cloud storage to an external hard drive.  Computer and digital device users also often create "backup," or duplicate, copies of their files.  In this way, digital child pornography is extremely mobile and such digital files are easily

reproduced, transported, and stored.  For example, with the click of a button, someone trading images and videos containing child pornography with others through an online instant messaging application can be copied and put onto other digital devices or media storage devices such as external hard drives small enough to fit onto a keychain.  Just as easily, these files can be copied onto compact disks and/or stored on mobile digital devices, such as smart phones and tablets.  Furthermore, even if the actual child pornography files are stored on a "cloud," files stored in this manner can only be accessed via a digital device.  Therefore, viewing this child pornography would require a computer, smartphone, tablet, or some other digital device that allows the user to access and view files on the Internet.

21.  LiveMe America, Inc., also known as "Live.me," ("LiveMe"), a social networking and electronic communications service provider headquartered at 7998 Santa Monica Boulevard, Units A & B, West Hollywood, CA 90046.  LiveMe is a popular free mobile application for mobile devices (i.e., smart phones, tablets, iPods, etc.).  LiveMe can be downloaded on Android or iOS devices.  LiveMe permits users to stream live video of themselves to an anonymous audience of LiveMe users who can post comments and interact with people in the video (i.e., give instructions or commands to the user).  LiveMe also allows users

to create groups where like-minded individuals can chat and or
text with other users and post videos and/or images.  LiveMe
utilizes the internet connection through the mobile devices'
cellular data plan or through Wi-Fi to send and receive
messages, photos, videos, and other content transmitted by users
through the LiveMe application.

22.  Each LiveMe user has the ability to create a username,
which can be changed at any time.  Every LiveMe account also has
a "SID" number which is displayed on the profile page under the
username.  The SID number is searchable within the LiveMe
application.  The SID number will remain consistent for the
specific account even if the username changes.  In addition,
every LiveMe account has a "UID" number that is hidden from
public view and not searchable within the LiveMe application.
No matter how many times a LiveMe user may change a username,
the UID will remain consistent for a specific account.

23.  Based on a review of company policy documents, along
with information provided by other law enforcement officers, I
know that LiveMe collects certain content created by users such
as: subscriber/registration information; user posts such as
images, video, audio, and text-based communications; data
associated with user posts, videos, messaging (including voice
and video), or other communications; and information about how
users connect to LiveMe, such as IP addresses and certain device

information.  Based on other agents' experiences in similar investigations, I am aware that LiveMe maintains the content of chats, images, and videos sent between users.

24.  Providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account, and other log files that reflect usage of the account.  In addition, providers often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

25.  In some cases, users will communicate directly with a provider about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users.  Providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any

actions taken by the provider or user as a result of the communications.

26.   Finally, I am aware from my training and experience that electronic service providers such as LiveMe may report illegal conduct on their platform, specifically conduct related to the sexual exploitation of children, to the National Center for Missing and Exploited Children.  These reports, known as Cyber Tipline Reports may contain information identifying a user, images, video, and/or text posted by a user on the company's servers in violation of terms of service and the law.

27.   Based on my training and experience, I know that chat applications are often used to communicate with others, including during the commission of crimes.  In particular, I know that LiveMe has become popular with individuals who have a sexual interest in children and images of children to discuss their interest with other like-minded individuals, including to share images and videos of child pornography.

28.   Mega Ltd, also known as "Mega," is based in New Zealand and operates an encrypted, file-hosting and cloud storage service available through web-based applications and mobile applications on Windows, iOS, and Android devices.  Mega offers storage capabilities ranging from 15GB to 8TB.  Mega mobile application allows users to access and stream files from a mobile device such as a phone or tablet.  Mega also provides

user controlled end-to-end encryption so intermediaries,
including Mega itself, cannot access user encryption keys or
stored data.

## VI.   **STATEMENT OF PROBABLE CAUSE**

### A.   **LiveMe User "Bbg051151" Posted a Link to Child Pornography, Including Images of Prepubescent Penetration**

29.   On February 24, 2020, as part of the investigation
into the exploitation of children online, an FBI OCE who is a
member of the SLCCETF, conducted an online undercover session on
LiveMe.

30.   The SLCCETF OCE accessed a LiveMe group titled "join"
which contained users who distributed videos and/or images of
nude prepubescent children, including infants and toddlers,
engaged in sexual acts with adults and/or other children.  The
profile image for the LiveMe group "join" depicted a nude
prepubescent female.

31.   The SLCCETF OCE observed that LiveMe username
"Bbg051151" (i.e., the SUBJECT ACCOUNT) posted a Mega link
(https://mega.nz/#F!WIkgRYrb!rKDSW0VLYGYtt3UFRx5uhA) on LiveMe
group "join."  The SLCCETF OCE utilized the Mega link to access
a folder titled "Kinky1" which contained seven folders totaling
39.27GB of content.  The SLCCETF OCE captured details of
approximately seven folders, including, but not limited to, the
following folders:

a. "chesepzza1" which contained two folders and 276 files;

b. "CP turbio" which contained 26 folders and 1791 files;

c. "CP turbio" which contained 26 folders and 1791 files;

d. "dos adolecentes en sillon se muestran"[3] which contained 165 files;

e. "file01" which contained 501 files;

f. "new folder" which contained 35 files; and

g. "vids2" and contained one folder and 172 files.

32. Many of the files previewed by the SLCCETF OCE appeared to be videos and/or images of nude prepubescent children, some engaged in sexual acts with adults and/or other children.

33. The FBI OCE downloaded 15 videos from Mega folder titled "Kinky1." Below are descriptions of four of these videos:

a. Video 1 (titled "8da25a1a-9593-4b6a-bbb2-eabdd09f044e"): Appeared to depict a nude adult place his erect penis repeatedly into a nude prepubescent female's vagina.

b. Video 2 (titled "c543886b-001b-457c-bbde-5b3285373402"): Appeared to depict a nude adult male wearing a

---

[3] A machine translation of "dos adolecentes en sillon se muestran" detected Spanish language and produced English translation of "two teenagers in armchairs are shown."

clown mask hold a nude prepubescent female's legs apart while placing a cylindrical object repeatedly into the female's vagina.

      c.   Video 3 (titled "cp dos niñas con hombre en silla de escritorio"[4]):  Appeared to depict an adult male place a female toddler wearing only a shirt in a chair.  The male repeatedly placed his fingers into the female toddler's vagina, then turned the female onto her knees and repeatedly placed his finger into her anus.

      d.   Video 4 (titled "cp mg27"):  Appeared to depict a compilation of video scenes.  Two scenes depict adult females placing their tongues on the vagina of prepubescent females.  Two scenes depict nude adult males placing erect penises into the vaginas of toddler females.

   **B.**   **LiveMe User "Bbg051151" Posted a Link to Possible Child Pornography**

   34.  On June 16, 2020, as part of the investigation into the exploitation of children online, an FBI OCE, who is a member of the Minneapolis Child Exploitation Task Force ("MPCETF")(the "MPCETF OCE"), conducted online undercover sessions on LiveMe.

   35.  The MPCETF FBI OCE observed that LiveMe user "Bbg051151" (the "SUBJECT ACCOUNT") was a member of LiveMe group

---

[4] A machine translation of "cp dos niñas con hombre en silla de escritorio" detected Spanish and provided an English translation of "cp two girls with man in desk chair."

"Wonderland" where the SUBJECT ACCOUNT posted a Mega link
(https://mega.nz/#FluShHBBLZ!Le9TBMlRAMckO472bjdQTA).   The
MPCETF OCE utilized the Mega link to access a folder titled "4k"
which contained 2.36GB of content and 208 files.   The MPCETF OCE
captured details of approximately 208 files which consisted of
primarily videos depicting pubescent minor females and young
adult females posed in various sexually explicit behavior.   Some
file titles are indicative of child pornography such as: (1) "11
yo girl rides the cock and loves it kiddy porn incest sex
naughty little girl slut, priceless, pussy, white, ass, gang~1";
(2) "12yr molly cowgirl;" and (3) "2012-01 Littleo
(Pthc)(Orgasm)_x264"[5].   However, it is not immediately apparent
from the content of the above videos that the videos contain
child pornography.

   **C.   Communication between FBI OCE and LiveMe User
        "Bbg051151"**

   36.   FBI Minneapolis conducted an investigation of a
subject involved in trading child pornography on LiveMe (the
"FBI Minneapolis Subject").   On approximately April 22, 2020 and
subsequent to obtaining consent, FBI Minneapolis accessed the
subject's LiveMe account and observed a conversation between the
FBI Minneapolis Subject and the SUBJECT ACCOUNT.   It appeared
that the SUBJECT ACCOUNT and the FBI Minneapolis Subject engaged
in a sexually focused conversation regarding the FBI Minneapolis

---

[5] The acronym "PTHC" is commonly used as an abbreviation for "Pre-
Teen Hard Core" pornography.

Subject's ten-year-old cousin.  Approximately between April 22, 2020 and June 16, 2020, the MPCETF OCE communicated with the SUBJECT ACCOUNT as follows:

**Bbg051151**:  what's her snapchat will sent you everything i get from her don't worry i won't hurt her or make her cry

**Bbg051151**:  Did you ever get her sbap

**OCE**:  Not for lack of trying. My aunt took her off snap. you working on anything good?

**Bbg051151**:  im always working on stuff good

**Bbg051151**:  [sent image depicting a young female in a bikini.]

**OCE**:  Me too. Started working on a new crush.

**Bbg051151**:  show me a pic

**OCE**:  I haven't screenshotted her yet. Trying to play it smooth. She is super cute tho, and very open.

**Bbg051151**:  does she have instagram i wont talk to her i promise. i wanna see what ur into. if you give me one of ur girls social meida ill give you one of mine.

**OCE**:  sc [Snapchat account identifier]

**Bbg051151**:  hey sorry haven't been on since earlier

**Bbg051151**:  i dont add girls with out a bitmoj[6]

**OCE**:  Interesting policy, but ok. I'll try to get you a pic anyhow.

---

[6] "Bitmoj" appears to refer to a personal emoji consisting of a cartoon avatar.

**Bbg051151**:  theres lots of dudes fishing on snapchat...
along with police so yeah.

[The chat ends here]


## IX. <u>REQUEST FOR SEALING</u>

37.   It is respectfully requested that this Court issue an
order sealing, until further order of the Court, all papers
submitted in support of this application, including the
application and search warrant affidavit.  I believe that
sealing is necessary because the items and information to be
seized is relevant to an ongoing investigation into criminal
conduct involving minor victims and as far as I am aware, the
targets of this investigation remain unaware that they are being
investigated.  Disclosure of the search warrant affidavit at
this time would seriously jeopardize the investigation, as such
disclosure may provide an opportunity to destroy evidence,
change patterns of behavior, or allow flight from prosecution.
Further, based upon my training and experience, I have learned
that online criminals often search for criminal affidavits and
search warrants via the Internet, and disseminate them to other
online criminals as they deem appropriate, i.e., post them
publicly online through forums.  Premature disclosure of the
contents of this affidavit and related documents may have a
significant and negative impact on this continuing investigation
and may severely jeopardize its effectiveness.

## **CONCLUSION**

38.   Based on the foregoing, there is probable cause to
believe that the evidence, fruits and instrumentalities of
violations of 18 U.S.C. §§ 2252A(a)(2)(A) (receipt and
distribution of child pornography) and 2252A(a)(5)(B)
(possession of child pornography), as described above and in
Attachment B, will be found in a search of the SUBJECT ACCOUNT,
as described in Attachment A of this affidavit.


_____
Special Agent Clint Wilmsen
Federal Bureau of
Investigation


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ____ day of
August 2020.

_____
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

ACCOUNT TO BE SEARCHED:

    The LiveMe account with SID 7838985 and/or UID 1221873140959944705, also known as "Bbg051151," that is stored at premises owned, maintained, controlled, or operated by LiveMe America, Inc., a company headquartered at 7998 Santa Monica Boulevard, Units A & B, West Hollywood, CA 90046.

**ATTACHMENT B**

A.   **SEARCH PROCEDURES**

1.   The warrant will be presented to personnel of LiveMe America, Inc. (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.   To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section C below.

3.   The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section C below to the law enforcement personnel specified below in Section D.

4.   With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section C below).  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.  The review of the electronic data may be

conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.   If the search team encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

6.   The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant.  The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7.   Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the

Court.  Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.    The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.    Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

B.    **INFORMATION TO BE DISCLOSED BY THE PROVIDER**

10.    To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.    All contents of all wire and electronic communications associated with the SUBJECT ACCOUNT, limited to that which occurred on or after February 24, 2020,[7] including:

---

[7] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this date restriction (for example, because a date filter is not available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

i.   All e-mails, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including stored or preserved copies of messages sent to and from the account, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each e-mail or message, and any related documents or attachments.

ii.   All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files.

iii. All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken.

b.   All other records and information, including:

i.   All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or e-mail addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers or physical addresses, the types of service utilized, account

30

status, account settings, login IP addresses associated with
session dates and times, as well as means and source of payment,
including detailed billing records, **and including any changes**
**made to any subscriber information** or services, including
specifically changes made to secondary e-mail accounts, phone
numbers, passwords, identity or address information, or types of
services used, and including the dates on which such changes
occurred, for the following accounts:

       (I)  the SUBJECT ACCOUNT.

     ii.  All user connection logs and transactional
information of all activity relating to the SUBJECT ACCOUNT
described above in Section II.10.a., including all log files,
dates, times, durations, data transfer volumes, methods of
connection, IP addresses, ports, routing information, dial-ups,
and locations, and including specifically the specific product
name or service to which the connection was made.

**C.   INFORMATION TO BE SEIZED BY THE GOVERNMENT**

    11.  For each SUBJECT ACCOUNT listed in Attachment A, the
search team may seize:

     a.  All information described above in Section
II.10.a. that constitutes evidence, contraband, fruits, or
instrumentalities of violations of violations of 18 U.S.C.
§§ 2252A(a)(2)(A) (receipt and distribution of child
pornography) and 2252A(a)(5)(B) (possession of child
pornography), namely:

31

i.    Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts.

ii.   Child pornography, as defined in Title 18, United States Code, Section 2256(8).

iii.  Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in Title 18, United States Code, Section 2256(8), including but not limited to documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography.

iv.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, in interstate commerce, including by computer, involving any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256(2)(B).

v.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

vi.   Any and all records, documents, programs, applications, or materials or items that are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct.  Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

b.   All records and information described above in Section II.10.b.

**D.   PROVIDER PROCEDURES**

12.  Notwithstanding 18 U.S.C. § 2252/2252A or any similar statute or code, the provider shall disclose responsive data by sending it to the following address via US Mail, or to the following email address:

FBI Special Agent Clint Wilmsen
1050 Lakes Drive, Suite 350
West Covina, California 91790
626-931-5527
cwilmsen@fbi.gov

13.  IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.